## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ANGELO JOSEPH GASPARRI

        Plaintiff,                      Civil Action No. _____

    v.

ERIC J. ALMAZAN,                    **JURY TRIAL DEMANDED**
PI KAPPA PHI FRATERNITY,
JUSTIN ANGOTTI, and
SCOTT LEIGHTY

        Defendant.

_____/

## VERIFIED COMPLAINT FOR DAMAGES

      Plaintiff, Angelo Joseph Gasparri, by his attorneys, Angelo A Gasparri, for his Complaint against Defendants, Eric Almazan and Pi Kappa Phi Fraternity alleges as follows:

## NATURE OF THE ACTION

    **1.**  By this action, Angelo Joseph Gasparri ("AJ", "Gasparri") seeks to recover damages for defamatory statements made by Eric Almazan ("Almazan") and Pi Kappa Phi Fraternity which resulted in substantial damage to Gasparri.

    **2.**  Gasparri, a student at Florida Atlantic University (FAU), played a substantial role in efforts to establish and charter a Chapter of Pi Kappa Phi Fraternity at the school.

    **3.**  Eric Almazan, a one time member of the Pi Kappa Phi Fraternity Associate Chapter on campus, made statements concerning Gasparri to Florida Atlantic University, Pi Kappa Phi Fraternity, and the public at large which were false, defamatory and injurious to Gasparri's Professional and Personal Reputation.

**4.**  Pi Kappa Phi Fraternity, relying on the statements of Almazan, without meaningful and responsible due diligence, and in spite of the availability of exculpatory information, then made statements concerning Gasparri to Florida Atlantic University, members of the Pi Kappa Phi Fraternity, and the public at large, which were false, defamatory and injurious to Gasparri's Professional and Personal Reputation.

**5.**  Pi Kappa Phi Fraternity's actions were in contradiction to their published and disseminated commitments to members, and violated their own rules of organizational governance outlined by the fraternity to the members of the associate chapter team at FAU.

**6.**  As a result of the statements made by Almazan and Pi Kappa Phi Fraternity, Gasparri was removed from his position in the Pi Kappa Phi Fraternity Chapter, placed on probation, assigned sanctions by Florida Atlantic University, and removed from an elected position in Student Government at Florida Atlantic University.

## **PARTIES**

**7.**  Plaintiff, Angelo Joseph Gasparri ("Plaintiff", "Gasparri" or "AJ") is domiciled in and a resident of Florida, residing in Palm Beach County and is not a public figure.

**8.**  Defendant Eric Almazan ("Almazan") is domiciled in and a resident of Kansas, residing within Johnson County.

**9.**  Defendant Pi Kappa Phi Fraternity ("PiKapp" or "the fraternity") is a North Carolina Corporation, specifically headquartered in Charlotte, North Carolina.  Pi Kappa Phi Fraternity is the parent organization of a number of chartered "fraternities" which operate with their oversight and direction on college campuses throughout the United States.  With regards to this lawsuit, it is the actions of staff members, employees and volunteers working directly for the corporation that resulted in the impacts described below.

## JURISDICTION AND VENUE

**10.** This Court has subject matter jurisdiction under 28 U.S.C §1332 as there is complete diversity of citizenship between plaintiffs and defendants and the amount in controversy exceeds $75,000, exclusive of costs and interest.

**11.** Jurisdiction over Almazan is proper because he transacts business within the State of Florida by attending College at Florida Atlantic University, a Florida Public University, and his defamatory statements were continuously transmitted within this judicial district.

**12.** Jurisdiction over Pi Kappa Phi Fraternity is proper because it transacts business within the state of Florida by chartering chapters at Florida College Campuses, including 13 listed on their website, and its defamatory statements were continuously transmitted in this judicial district.

**13.** Venue in this district is proper under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claim occurred in the district.

## BACKGROUND LEADING UP TO THE TORTIOUS ACTS

**14.** Pi Kappa Phi Fraternity established a "colony" or associate chapter at Florida Atlantic University and began recruiting members to establish and found a chapter in Fall of 2013.

**15.** Plaintiff Gasparri was bid (i.e., invited to membership) and pre-initiated on the same day in mid-late February becoming approximately the 19th member of the Pi Kappa Phi associate chapter at Florida Atlantic University ("FAU").

**16.** Approximately two weeks later, Gasparri was elected to the non-executive board position of recruitment chair with responsibility for assisting the Vice-President or "Vice-Archon" with

the chapter's member recruitment efforts, and specifically those efforts during fall recruitment season or "rush" at FAU as outlined within PiKapp's membership guide "The White Diamond".

17. After substantial preparation and planning, fall recruitment at FAU began on September 3rd, 2014.  During this time, Plaintiff Gasparri was exceptionally active and visible both as a chapter leader generating activity amongst the members and as the face of the fraternity charged with seeking out and developing relationships with potential New Members.

18. Through AJ's efforts, at the end of recruitment season, the chapter had essentially doubled in size, having recruited and "pre-initiated" more than twenty additional members to the chartering chapter by the general end of recruitment week of September 10th, 2014.

19. The Fraternity responded well to the success, and as was previously planned the September 13th 2014 FAU football home game against Tulsa would serve as a day of fraternal celebration open to all members.

20. During this day, AJ's participation included helping prepare, setup and break down a tailgate party for the members before and during the game.  As a leader of the fraternity, and the fraternity member that many of the new members were most familiar with, he was highly visible during this activity.

21. In compliance with both school policy and the laws of the State of Florida AJ did not consume or purchase any alcohol on the date of September 13th, 2014, nor did AJ cause anyone else to consume alcohol.

22. Although the origin of the gathering is uncertain and is likely rooted in the general feeling of success and celebration surrounding the fraternity members, shortly after the game on September 13th, 2014 an informal get together or party was held at the residence of Harry Weiss ("Harry") in Addison Park or what is now referred to as University View.

**23.** FAU's policies allow students who are over 21 years of age to consume alcohol both on and off campus.  As a result, students over 21 years of age arriving at Harry's gathering with their own alcohol were allowed into the party, and would not be violating any rules of conduct. Further, the event was not a PiKapp sponsored event.

**24.** Harry's home was a small off campus townhome with limited space.  It rapidly became overheated in the hot Florida evening.  Further, it was not designed to host a gathering as large as this event became, eventually there were more than 35 people attending.

**25.** As is a common practice amongst campus fraternities when there are a large number of members at a non-fraternity event,  PiKapp would mark students on the hand who were not old enough to drink.   This "Mark" was intended to "signal" and assist others at the event not to make the mistake of sharing alcohol with those who were not of the proper age.  During the gathering at Harry's, AJ and a number of other PiKapp members stood at the Front door checking individuals and marking people who were 18-20 years old.  Those old enough to drink were not marked.  (No one under 18 was allowed to participate in the event that night.)

**26.** At approximately midnight Kyle Muir ("Kyle"), the elected New Member Educator and "Warden" for PiKapp called down the members that had been recently recruited and pre-initiated. As the Warden, it is his job to provide training and education on the elements of PiKapp that are unique and support the organization in propagating its fraternal nature.  As was encouraged by PiKapp, brotherhood was not something that existed only at formal events, but was an element of their social relationship at all times.

**27.** It is not clear why the Warden called the meeting, it was not a planned event, nor was it approved by the executive committee.  It appears to have been simply a spontaneous opportunity after a day of celebration to reinforce the PiKapp experience.

**28.** At Kyle's request, AJ left his position at the door and assisted Kyle and Harry leading members to the garage of the building.

**29.** Once inside the garage, the newly pre-initiated members attending (it is unclear how many new members were there, but estimates range from 10 to 18), stood in a semicircle around three wooden letters symbolizing the PiKapp fraternity and facing the Warden.

**30.** As the townhouse was furnished by college students, the lighting throughout the home was insufficient, as was the air conditioning, leaving the home hot and dark.

**31.** Sometime after the Warden had addressed the new members, AJ, who is well known as a public speaker and had extensive accomplishments as a leader throughout his career, was invited to speak.  He shared about his personal commitment to PiKapp, what brotherhood meant to him, and the importance that chartering represented to their chapter.

**32.** Unbeknownst to AJ, a bottle of "Southern Comfort" whiskey was present in the Garage at the time of the gathering.  Based upon information gained later, it is believed that Harry had brought this bottle with him to the meeting.  It is unclear as to how and why the bottle was passed during the presentations by the Warden, AJ and others.

**33.** It is clear that if the bottle was passed around the dark room, some people may have drank from it, some people did not.  Moreover, AJ never drank from the bottle, never touched the bottled in any way and did not encourage anyone in the garage to "drink" anything.

**34.** No individual, member, new member or otherwise had their movement in any way restricted during the speeches.  All parties were free to leave, and no one was observed seeking the opportunity to depart. No PiKapp member engaged in any action that could be construed as hazing or indoctrination of any kind within the garage.

**35.** After the speeches completed, the downstairs group dispersed with the majority of participants returning back to the second floor of the townhome.

**36.** After completion of the downstairs meeting, there was no evidence that anyone was in anyway upset or bothered by the opportunity to discuss being a member of the fraternity. Further, no complaints were ever communicated to the Warden or any other officer within the organization at any time proximate to the event.

**37.** In fact, quite the opposite was true, many new members including Kevyn De La Cruz were outwardly demonstrative about the experience and believed it truly set a positive tone for the membership.

**38.** At approximately 2:00 am, Harry approached AJ and requested assistance in asking individuals to leave the residence.  At the time, there were still a number of PiKapp members, as well as their friends at the gathering.  Despite the request they remained at Harry's home.

**39.** Miguel Rodriguez ("Miguel"), the then President of the PiKapp chapter, eventually gathered many of the remaining participants at the party in the garage and encouraged everybody to clean up Harry's residence which showed the wear and tear of a large gathering of college students.

**40.** Most remaining participants ignored the request made by Miguel, and the party continued for approximately another hour to an hour and half with the majority of the party dispersed by approximately 3:30 am.

**41.** There were no derogatory reports, or any event that would have led AJ or any other member of the executive committee to view the day as anything but a successful celebration and a great beginning to a year they hoped would culminate with the chartering of the FAU chapter of PiKapp.

**42.** At approximately the end of September 2014, AJ was elected to the position of Risk Management Chair for PiKapp's Associate Chapter at FAU.

**43.** On November 2nd, 2014 AJ was elected President of the PiKapp Associate Chapter at FAU.

**44.** On January 1st, 2015 AJ's term as President of the PiKapp Associate Chapter at FAU commenced.

**45.** As part of his role as President or "Archon", AJ attended mandatory training on January 2nd through January 4th, 2015 in Charlotte, North Carolina at his own expense. The remaining members of the executive board also traveled to the meeting at their own expense. The training session was hosted and run by Pi Kappa Phi fraternity.  This training covered many aspects of what Pi Kappa Phi believed to be important to the growth and development of a strong chapter and reinforced their mission & vision shown in Exhibit 1.

**46.** This training also covered The Creed of Pi Kappa Phi which outlines the "ideal chapter" shown in Exhibit 2.

**47.** At one of the sessions attended by AJ and Aaron Sherman, the then Risk Management Chair, the representatives of Pi Kappa Phi Fraternity specifically asserted that if any accusations or issues arose in relation to the chapter, AJ and the Chapter would be provided with support from the national organization of PiKapp, and if necessary, PiKapp would even provide legal assistance.

**48.** This offer and promise was made in the context of the environment of brotherhood reinforced by PiKapp and emphasized by published language that included terms like "loyalty", "responsibility", "accountability" and "commitment".  Leaving AJ and the other members of the FAU associate chapter reassured that they were part of a national organization that was

committed to their success at FAU and would be there to address the challenges they would encounter on the way to chartering the chapter.

**49.** AJ's commitment and loyalty to the success of the chapter was the continuous effort he put into the organization.  This included hundreds of hours of service, direct leadership, monetary contributions and a choice to focus on the growth and founding of the chapter as a core experience of his collegiate career, at significant cost to other areas of opportunity, focus and pursuit.

## THE TORTIOUS ACTS OF ERIC ALMAZAN AND PI KAPPA PHI FRATERNITY

**50.** On or about February 24th, 2015 at 3:05pm, AJ in his role of Archon, and Josh Shorey the treasurer of the FAU associate chapter met at a local Starbucks to review the chapter's finances.  They used a PiKapp approved tool called "OmegaFi" to identify and send an email to anyone who left the chapter and still owed fees.   As the current President, AJ's name was on the form email that went to the delinquent former members from the program (*Exhibit 1*).

**51.** On or about February 24th, 2015 at 3:36pm Eric Almazan (Eric) sent an email to AJ's FAU email account from his Hotmail account. The email stated that Eric was going to dispute the balance. His basis for the dispute was that he "was never initiated into the fraternity and withdrew from the University" *(Contained within Exhibit 2).*

**52.** On or about February 24th, 2015 at 7:59pm AJ sent an email to Eric's Hotmail account from AJ's personal AOL account. AJ stated that Eric was a part of the organization for one semester and the PiKapp associate chapter still had to pay for Eric's "insurance as well as other fees and expenses".  AJ asserted that Eric "still must pay [Eric's] dues for [Eric's] tenure in the fraternity" *(Contained within Exhibit 2).*

**53.** On or about February 25th, 2015 at 6:44am Eric sent an email from his Hotmail account to AJ's AOL account. Eric stated in the email that he was going to "contact the proper FAU officials to notify them of hazing". AJ did not respond to this email *(Contained within Exhibit 2)*.

**54.** Nearly immediately thereafter, at approximately 10:19 am on February 25th, 2015 AJ sent an email to Tyler Johansson and Allison Foster (jointly, "the advisors") from his AOL account *(contained within Exhibit 2)*. Johansson and Foster were the designated advisors for PiKapp.  They were assigned to him to provide guidance on leading and managing the affairs of the PiKapp chapter. AJ was directed to contact the advisors immediately if he required assistance, an opportunity AJ respected and used sparingly.

**55.** The email to the advisors included the entire copy of the conversation he had by email with Almazan. AJ also included a brief summary of the context of the communication including reference to the OmegaFi form letter. AJ also stated that "I can assure you that what he mentions as a potential accusation is completely false however I'm not as naïve to think that a false accusation bears no harm" *(contained within Exhibit 2)*.

**56.** The email to the advisors also included a proposed response to Almazan for the advisors to provide AJ with feedback in addressing the matter *(Contained within Exhibit 2)*.

**57.** At some time thereafter, the advisors communicated to AJ and directed him not to take any action.

**58.** On information and belief, the plaintiff asserts that at some point between approximately February 25th and March 6th, Eric Almazan did publish accusations of a libelous and defamatory nature against AJ Gasparri to Pi Kappa Phi Fraternity.

**59.** On information and belief, the plaintiff asserts that at some point between approximately February 25th and March 6th, Eric Almazan did publish accusations of a libelous and defamatory nature against AJ Gasparri to Florida Atlantic University.

**60.** On information and belief, the plaintiff asserts that Eric Almazan published these accusations with the specific intent to do harm to AJ Gasparri as retribution for the action of collecting past due balances from former members.

**61.** On information and belief, the plaintiff asserts that these actions were specifically published to Pi Kappa Phi Fraternity and FAU through a variety of means and over a consistent course of action which propagated the deceitful, libelous and defamatory statements purposely with the intent to exacerbate the harm.

**62.** On information and belief, the plaintiff asserts that these accusations included allegations of hazing at the party held at Harry's home with specific accusations of physical confinement and forced drinking, and that these allegations were knowingly made by Almazan without a factual basis and with awareness of the harm they would cause.

**63.** On information and belief, the plaintiff asserts that Almazan repeated these and other allegations verbally to both PiKapp and FAU agents.

**64.** On or about March 6th, 2015 at 7:04pm, AJ emailed Scott Leighty (Leighty), PiKapp's Director of Chapter Development, and copied Tyler Johansson on items regarding preparation to charter the Associate Chapter at FAU.

**65.** No response to this email was ever received by AJ from any member of the PiKapp community, and AJ began to recognize that PiKapp had simply abandoned him.

**66.** Later in the month of March 2015, during FAU's designated Spring Break, AJ received a call from Leighty without warning or prior arrangement while AJ was in the process of caring for

his girlfriend after oral surgery.  In this call, and without any prior discussion or notification, Leighty began to examine AJ on a "party" that had taken place sometime the prior semester after recruitment.

**67.** Leighty feigned ignorance regarding the specific "party" at issue, and stated that he was not aware of the communications from AJ to the advisors regarding the Almazan matter.  AJ determined that the "party" at issue was the one described supra which took place at Harry's home on the day of the football game.

**68.** During this conversation, AJ shared that for the most part he was present at the "door" and that he did not remember anything of note taking place that needed to be communicated. Leighty continued pressing forward with his demand for answers, and AJ did share that at various times during the evening, the new members and members were in the garage for a meeting. AJ also confirmed that there was drinking at this non-PiKapp, off campus event.

**69.** During this call, AJ asked if the reason for inquiry was rooted in a complaint by Eric Almazan.  Leighty confirmed this to be the case, and again responded that he had not paid attention to any communication from the advisors on the matter.

**70.** AJ received no further requests for information from PiKapp or any other individual.  He also received no further communications from PiKapp, Leighty or the advisors.

**71.** At one point prior to March 11th, 2015, AJ phoned the National President of the PiKapp Fraternity who AJ had met briefly at the National Conference, where he was encouraged to call the President when circumstances demanded it. Once AJ stated his name the call was disconnected.

**72.** On or about March 10th, 2015 at 9:55pm AJ received correspondence from the FAU Dean of Students Office requesting that he meet with Dr. Faerman, the Interim Dean on March

13th, 2015 at 3:30 pm. After some initial confusion on the date and time of the meeting, AJ confirmed the meeting.

**73.** On or about March 12th, 2015, Leighty sent a text message to AJ acknowledging receipt of a voicemail from AJ seeking assistance and feedback on the matter, and Leighty requested a conference call.  The conference call was confirmed for March 13th, 2015 at 11:00 am with AJ, the advisors and Leighty.

**74.** Prior to the call with the PiKapp team, AJ retained an attorney to provide advice and counsel on the matter.  On the advice of counsel, he arranged to take the PiKapp call at the Lawyer's office, and prior to the meeting with the Dean of Students.

**75.** On March 13th, 2015 at approximately 11:00am AJ joined the conference call privately. The call included not just the advisors and Leighty, but Justin Angotti ("Angotti"), the Assistant Executive Director of Education and Accountability at Pi Kappa Phi Fraternity organization.

**76.** Leighty began the call, but Angotti quickly took the lead in the discussion.  Angotti directed accusations of misconduct at AJ and informed him that the decision to remove him from his position as Archon and revoke his membership to Pi Kappa Phi had already been made.

**77.** Angotti indicated on the call that this decision had been signed off on by the National President of the organization.

**78.** AJ requested clarification of the purposes of the meeting, and his request was met with continued accusations by Angotti.  Angotti continued to spit forth his conclusions in what could only be described as an unprofessional, rude and disrespectful tone.  (Individuals outside the office AJ was using commented on hearing the raised voice coming over the phone.)

**79.** At no time between the initial spring break call by Leighty, and the morning conference call led by Angotti did Pi Kappa Phi Fraternity discuss the matter with AJ. Further, they never

addressed the matter of the Almazan emails that AJ had requested immediate assistance with before taking action.

**80.** Later in the day, AJ arrived with his Legal Counsel to his first meeting with Dr. Faerman, the Interim Dean of Students.  The Dean immediately rescheduled the meeting as he was unwilling to discuss the matter without having his own counsel present.  This essentially left AJ without any insight into the accusations being made against him, removed from his role as Archon and expelled from participation in Pi Kappa Phi.  A role that he had invested more than twenty hours a week since joining.  This circumstance left him with a great deal of stress, anxiety and emotion that impacted his ability to focus on school.

**81.** On or about March 15th, 2015 at approximately 12:54pm, Justin Angotti sent an email from his Pi Kappa Phi Fraternity account to AJ's AOL email account.  In the email, Angotti stated that there is "sufficient information to indicate AJ was involved in a significant violation of Pi Kappa Phi's risk management policy and standards of conduct." Angotti goes on to state that "there is sufficient information to indicate that [AJ] knowingly provided false information to the staff and advisors" of PiKapp.  *(See Exhibit 3)*

**82.** On or about March 15th, 2015 at 1:59pm Justin Angotti sent an email from his Pi Kappa Phi Fraternity account to the members of the FAU associate chapter in which he propagated false, defamatory and libelous information designed to place blame upon, and discredit AJ Gasparri, in a blatant and repulsive attempt to avoid any issue or impact to Pi Kappa Phi's attempts at expansion at a time when fraternities were under public scrutiny.  *(See Exhibit 4)*

**83.** Angotti's actions were in direct contradiction to the Mission, Vision and Creed published by PiKapp, trained at their yearly meeting and asserted as the way in which the brotherhood

established its fraternal principals.  *(see Exhibits 5 and Exhibits 6)* Further, these actions were a direct breach of the promises made to the associate chapter.

**84.** In the email to the associate chapter, Angotti continued "it was alleged that during the chapter's Fall 2014 'bid day' party, the chapter's newest associate members were taken into a garage and encouraged and/or forced to consume liquor that was mixed with pre-workout supplement."  This, as well as other statements made by Angotti, were knowingly false statement, which he published to defame AJ and to forward his own purposes.  *(Contained in Exhibit 4)*

**85.** Angotti's email continues his defamatory publication with "The Fraternity's investigation corroborated the initial report and specifically identified two members of the chapter who led the activity — Miguel Rodriguez and AJ Gasparri. This behavior constitutes a serious violation of the Fraternity's risk management policy and poses significant risks to the safety and well- being of our members."  This statement, as well as other made by Angotti, was knowingly false and made to forward his own purposes.  *(Contained in Exhibit 4)*

**86.** Angotti's email further asserts the following false and defamatory statements against AJ "Additionally, it should be noted that throughout the course of the Fraternity's investigation into the alleged incident, AJ provided false statements to the staff and local advisors, denying any involvement in or knowledge of the incident. Lying is incongruent with Pi Kappa Phi's values and ideals. It is unacceptable from any of our members; particularly the chapter's elected leadership."  *(Contained in Exhibit 4)* No further discussions on the matter were ever held with AJ, and given that the only inquiry was during the spring break call in which Leighty quickly, and without notice asked questions out of context, it is difficult to perceive the speed with which PiKapp chose to publish this falsehood.

**87.** On information and belief, Pi Kappa Phi Fraternity, through Angotti or other representatives propagated and published these false accusations to members of the FAU community by both email and voice, and did cause the plaintiff substantial and irreparable harm through these publications.

**88.** Pi Kappa Phi Fraternity successfully chartered their FAU Associate Chapter in April of 2015, having successfully scapegoated AJ as the easiest way of avoiding the impact of responsibly dealing with a disgruntled member.

## THE AFTERMATH OF THE TORTIOUS ACTS AND DAMAGES

**89.** Over a several month period, beginning with the initial letter from the FAU Dean of Students office on March 10th, 2015, and ending approximately May 1st, 2015 AJ and his attorney participated in a number of meetings with the office of the Dean of Students and the FAU General Counsel's office addressing the defamatory charges.

*90.* On April 15th, 2015, FAU filed a Notice of Charges against AJ for violations of the FAU Code of Conduct.  *(See Exhibit 7)*

**91.** During this time period, AJ provided a variety of production and oral testimony to the FAU Dean of Students, including a full narrative of the events, eleven affidavits of participants in the events corroborating AJ's testimony to the Dean *(collectively contained herein as Exhibit 8)*, the letters from Almazan threatening his libelous actions, and copies of correspondence between AJ and Pi Kappa Phi organization immediately asking for assistance in the matter.

**92.** The FAU Leadership proffered that Pi Kappa Phi had made the choice to corroborate accusations made by Almazan, and that despite the school's gathering of information, that was sufficient for a Code of Conduct hearing and moving forward with the investigation.

**93.** FAU's Code of Conduct Hearing is an administrative, non-evidentiary forum in which faculty members and student employees of the Dean of Students Office review violations of the conduct code.  The results of the forum are generally thought to be heavily weighted in the school's favor.

**94.** AJ and his attorney negotiated a settlement with FAU's Dean of Students in which no findings of fact or admissions were made, an unusual result deemed warranted by the totality of the circumstances.  The settlement included two years of probation, essentially all of AJ's remaining time at FAU, 25 hours of community service, completion of an ethics seminar and payment of the $100 fee. *(See Exhibit 9)*

**95.** Despite the ongoing controversy, on May 12th, 2015 AJ was elected House Speaker of the FAU Boca Raton House of Representatives. The House Speaker position included a parking space, hourly pay, and an office. The position was elected by the FAU Boca Raton House of Representatives, which consists of FAU Boca campus students.

**96.** On June 3rd, 2015 AJ was removed from the House Speaker position by the FAU Vice President of Student Affairs stating that AJ's removal was due to his student conduct probation. The student conduct probation was a result of the procedures that took place due to the allegations made against AJ.

**97.** At the time of AJ's removal as Archon, he had loaned the fraternity more than $1,100 of his personal funds to directly support Pi Kappa Phi Fraternity's growth on campus.  This money was properly recorded on the records of the associate chapter, and was due and owing at the time of his removal.  Subsequent demands for payment were denied.

**98.** AJ has expended more than $7,000 in attorney's fees and costs defending himself against the accusations made by Almazan and Pi Kappa Phi Fraternity.

**99.** AJ has undergone an extraordinary amount of stress, anxiety and anguish from these actions.  He has participated in counseling, and chose to skip a semester of school until such time as he feels confident in participating again in campus life.

**100.**    AJ left high school with an extraordinary record of service and leadership, and chose FAU because he thought that as a presidential scholar, the campus offered the type of opportunities for involvement that he sought in his career as a college student.

**101.**    The achievement of Fraternity President and Speaker of the House as a sophomore are indicative of his capabilities and commitment, and Almazan and Pi Kappa Phi's through their Actions have done irreparable harm to AJ.

**102.**    The loss of these significant leadership opportunities have dramatically impacted his collegiate experience, his ability to continue to grow and gain additional experience in student government and AJ's ability to demonstrate the skills he has developed and gained to a level that it will inhibit his pursuit of future employment and/or graduate school opportunities.

## COUNT 1:  DEFAMATION

*(Against Defendant Almazan)*

**103.**     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 102 as if fully set forth at length herein.

**104.**     Defendant Almazan Defamed AJ Gasparri through Libelous and Slanderous behaviors.

**105.**     Almazan's Statements were made with reckless disregard of their truth or falsity, and were made with malice.

**106.**     These statements were published to third parties including the Pi Kappa Phi Organization, Florida Atlantic University Administration and others by electronic mail.

**107.**     Almazan repeated and extended these publications by verbally stating them to members of the Pi Kappa Phi Organization, Florida Atlantic University Administration and others.

**108.**     Almazan's Statements were widely published and not privileged in any manner.

**109.**     Almazan's written statements were libelous per se as the statements contained false and inflammatory accusations.

**110.**     Almazan's verbal statements were slanderous per se as they contained specific statements designed to negatively impact Gasparri's personal and professional reputation, as well as his standing within the school.  Further, he accused Gasparri of actions that were in violation of the FAU code of conduct and state law, including criminal violations.

**111.**     The defamatory, slanderous and libelous statements made by Almazan caused substantial harm to Gasparri's personal and professional reputation impacted his academic career and caused substantial economic damages to the Plaintiff.

WHEREFORE, Almazan should be found to have defamed Gasparri and caused damages. Gasparri requests judgment against the defendant for Defamation and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

## COUNT 2:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Defendant Almazan)*

**112.**     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 102 as if fully set forth at length herein.

**113.**     Almazan intentionally and deliberately inflicted emotional distress on Gasparri by defaming him to many people, including members of Pi Kappa Phi, Florida Atlantic University administration and others.

**114.**     As a result of Almazan's extreme and outrageous conduct, Gasparri was, is, and with a high degree of likelihood, will continue to be emotionally distressed due to his defamation of him.

**115.**     As a result of Almazan's extreme and outrageous conduct, Gasparri has suffered and will continue to suffer mental pain and anguish, severe emotional trauma, embarrassment and humiliation.

WHEREFORE, Almazan should be found to have intentionally caused emotional distress to Gasparri and caused damages.  Gasparri requests judgment against the defendant for the intentional infliction of emotional distress and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

## COUNT 3:  DEFAMATION

*(Against Defendant Pi Kappa Phi, Justin Angotti and Scott Leighty)*

116.     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 102 as if fully set forth at length herein.

117.     Defendants Pi Kappa Phi Fraternity, Justin Angotti and Scott Leighty did make defamatory publications described herein ("Statements") in writing and verbally concerning Gasparri and they were knowingly false.

118.     The statements made by Defendants Pi Kappa Phi Fraternity, Justin Angotti, and Scott Leighty were widely published within the Pi Kappa Fraternity community, Florida Atlantic University's administration and others, and not privileged in any manner.

119.     The Statements made by Defendants Pi Kappa Phi Fraternity, Justin Angotti and Scott Leighty Statements were made with reckless disregard of their truth or falsity and/or with malice, with the specific intention of "scapegoating" Gasparri, and avoiding a true inquiry into the matter.

120.     These Statements were libelous per se because their content contained false and inflammatory information.

121.     These verbal statements were slanderous per se as they contained specific statements designed to negatively impact Gasparri's personal and professional reputation, as well as his standing within the school.  Further, they accused Gasparri of actions that were in violation of the FAU code of conduct and state law, including criminal violations.

122.     The defamatory, slanderous and libelous statements made by defendants Pi Kappa Phi, Angotti and Leighty's caused substantial harm to the personal and professional reputation of

Gasparri, impacted his academic career and caused substantial economic damages to the Plaintiff.

WHEREFORE, Pi Kappa Phi, Angotti and Leighty should be found to have defamed Gasparri and caused damages.  Gasparri requests judgment against the defendants for defamation and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

## COUNT 4:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Defendant Pi Kappa Phi Fraternity, Justin Angotti and Scott Leighty)*

123.     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 124 as if fully set forth at length herein.

124.     Defendants Pi Kappa Phi Fraternity, Justin Angotti and Scott Leighty intentionally and deliberately inflicted emotional distress on Gasparri by defaming him to many people, including members of Pi Kappa Phi, Florida Atlantic University administration and others.

125.     As a result of their extreme and outrageous conduct, Gasparri was, is, and with a high degree of likelihood, will continue to be emotionally distressed due to his defamation of him.

126.     As a result of their extreme and outrageous conduct, Gasparri has suffered and will continue to suffer mental pain and anguish, severe emotional trauma, embarrassment and humiliation.

WHEREFORE, Pi Kappa Phi, Angotti and Leighty should be found to have intentionally inflicted emotional distress upon Gasparri and caused damages.  Gasparri requests judgment

against the defendants for the intentional infliction of emotional distress and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

## COUNT 5: CAUSE OF ACTION FOR BREACH OF CONTRACT

*(Against Defendant Pi Kappa Phi Fraternity)*

**127.**     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 102 as if fully set forth at length herein.

**128.**     Gasparri was acting in the capacity of an agent of Pi Kappa Phi Fraternity in pursuing the requirements of chartering.

**129.**     Pi Kappa Phi through actions and continuous pattern of business relationship did recognize Gasparri as the senior member of their team at FAU, and recognized his title of Archon.

**130.**     At all times described herein, AJ believed himself to be a member of the Pi Kappa Phi Fraternity and believed that "The Gold Book of Pi Kappa Phi Fraternity" ("Gold Book", *see Excerpts contained in Exhibit 10)*, a document used by the chapter with the knowledge of PiKapp applied to him.

**131.**     Gasparri attended mandatory training in which the fraternity published their mission, vision and creed.  The Fraternity also shared openly the tenets of brotherhood and the strength of relationship between Pi Kappa Phi and the members who participate in their collegiate chapters.

132.     An implied in fact contract existed between PiKapp and Gasparri, where PiKapp provided a national organization to support development of a fraternal organization on the FAU campus, and AJ provided  funds and significant hours in support of this effort.

133.     During the training, the fraternity, both in general and specifically, asserted their commitment to support Gasparri in chartering the fraternity and provide him what was needed in order to support chartering. This included mentoring, coaching and direct advice and counsel on how to handle the efforts of managing the growth and chartering of the chapter.

134.     Gasparri continued to work diligently to charter the fraternity at FAU and managed and maintained the procedures required of him by PiKapp.  Demonstrating that he was continuing to work in alignment with the implied contract in fact.

135.     Recognizing the threat by Almazan, Gasparri immediately notified his chain of communication.

136.     The next communication and direction Gasparri received was to be fired from his role and removed from the fraternity.

137.     Gasparri has suffered irreparable harm by the fraternity failing to honor their commitment to support him pursuing chartering, provide him the support required to address the issue at hand, and by terminating the relationship without due diligence.

138.     They have breached the contract by failing to live up to the purposes and objectives promised at the training, published on their website and propagated throughout their brotherhood, for loyalty, responsibility, commitment, etc.

139.     They have breached the contract by failing to uphold the implied promises published within the Gold Book, including but not limited to, hearings and inquiries, notice,

punishment procedures, notification procedures, opportunities for appeal and the presentation of evidence, etc.

WHEREFORE, Pi Kappa Phi should be found to have breached an implied in fact contract with Gasparri and caused damages. Gasparri requests judgment against the defendant for breach of contract and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

## COUNT 6:  NEGLIGENCE

*(Against Defendant Pi Kappa Phi)*

**140.**     Gasparri repeats and re-alleges the allegation set forth in paragraphs 1 to 102 as if fully set forth at length herein.

**141.**     Pi Kappa Phi is a national organization dependent upon the enlistment of volunteer resources on campuses across the country to expand their brand.  In this case, they chose to charter a fraternal organization on the campus of FAU.  An activity they had managed and launched many times.

**142.**     Gasparri was their agent in this effort, and PiKapp represented their successful experience in conducting similar efforts successfully chartering this type of on campus brotherhood.  PiKapp owed a duty to AJ as their agent in this matter to behave in a responsible and prudent manner in chartering a new organization on campus.

**143.**     As a national organization devoted to the extension of fraternal brotherhood, the organization had the duty to act in a prudent manner in establishing policies, procedures and management structures that would properly support the implementation of a new chapter.

144.	PiKapp breached this duty by failing to manage a process that vetted the information provided by Almazan prior to publishing this information to third parties.

145.	They further had the duty to properly coach, train and assign their own management and leadership team in a manner that would fulfill upon the nature of their efforts, and responsibly support their on campus agents in succeeding.

146.	PiKapp's agents chose to limit the inquiry and then unprofessionally terminate AJ without investigation in a manner that included berating and shouting at him.

147.	PiKapp breached this duty by failing to have competent staff and leadership in place to respond to inquiries by members, and properly respond in a professional, prudent and responsible manner that would not leave to damage to one of their members.

148.	PiKapp breached this duty by publishing information to Florida Atlantic University, a third party, without regard to the impact it would have on one of their members, and did so with the specific intention of protecting themselves, rather than employing the care a prudent organization would have in similar circumstances.

149.	PiKapp breached its duty to AJ by failing to adhere to its own internal policies and procedures as published within "The Gold Book of Pi Kappa Phi Fraternity".  *(Excerpts contained herein as Exhibit 10).*

150.	In the case at hand, a communication by one of their on campus agents to the designated contact person seeking advice and counsel on a troubling matter resulted in substantial damage to that agent.  Had Pi Kappa Phi responsibly responded to the matter, the entire event would not have injured Gasparri.

151.	The negligent actions of Pi Kappa Phi in failing to responsibly put trained individuals in place, as well as their failure to manage policies and procedures a prudent similarly

situation organization would employ were directly responsible for the situation caused damage to Gasparri.

WHEREFORE, Pi Kappa Phi should be found to have behaved in a negligent manner that breached their duty to Gasparri and caused damages.  Gasparri requests judgment against the defendant for negligence and an award of compensatory damages, including consequential and incidental damages, interest and costs incurred as a result of bringing this action, and for any other relief as the Court finds just and proper.

<h2 style="text-align:center"><u>JURY DEMAND</u></h2>

Pursuant to Rule 38 of the Federal Rules of Civil procedure, Plaintiff demands a trial by jury in this action for all issues so triable.

<h2 style="text-align:center"><u>RESERVATION OF CLAIM FOR PUNITIVE DAMAGES</u></h2>

Plaintiff reserves the right to bring a claim for punitive damages against each defendant, and for all counts.

## **VERIFICATION**

I, Angelo Joseph Gasparri, am the Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Palm Beach County, Florida.

Signed By: _____      Dated: ___10 / 9 / 15___

Ángelo J. Gasparri

STATE OF FLORIDA

COUNTY OF PALM BEACH

Sworn to (or affirmed) and subscribed before me this __9th__ day of 20_15_, by Angelo Joseph Gasparri.

_____
(Seal) Signature of Notary Public
Print, Type/Stamp Name of Notary
Personally known:____✓____
OR Produced Identification:_____
Type of Identification Produced:_____

Robert Alexander Gusrae
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF031285
Expires 6/26/2017

The Law Offices of Angelo A. Gasparri, PA
By: ___/s/ Angelo A. Gasparri_____

Angelo A. Gasparri, Esq. (FBN 32158)
1080 S. Federal Highway
Boynton Beach, FL  33435
Phone:        561-826-8986
Fax:           561-935-9706
Email:        angelo@drlclaw.com