# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

ANGELO JOSEPH GASPARRI

        Plaintiff,                        Civil Action No.: 9:15-cv-81400-KAM

    v.

ERIC J. ALMAZAN,
PI KAPPA PHI FRATERNITY,
JUSTIN ANGOTTI, and
SCOTT LEIGHTY

        Defendant.

_____/

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS', PI KAPPA PHI FRATERNITY AND JUSTIN ANGOTTI,
## MOTION TO DISMISS

       Plaintiff in the above captioned case, by and through his undersigned Counsel and responds to Defendant Pi Kappa Phi Fraternity and Defendant Justin Angotti's joint Motion to Dismiss various elements and counts of the Plaintiff's complaint.  For the reasons set for below, the Plaintiff requests this Court to deny the motion to dismiss in its entirety.

## I.      INTRODUCTION & STATEMENT OF FACTS

       1.      At all times material to this cause, Defendant Pi Kappa Phi Fraternity ("PiKapp" or "the fraternity") is a North Carolina Corporation. Pi Kappa Phi Fraternity is the parent organization of a number of chartered "fraternities" which operate with their oversight and direction on college campuses throughout the United States. (Comp. ¶ 9).

       2.      At all times material to this cause, Defendant Justin Angotti ("Angotti") was an employee and held the position of Assistant Executive Director of Education and Accountability at the Pi Kappa Phi Fraternity organization. (Comp. ¶¶ 9, 75).

       3.      At all times material to this cause, Defendant Scott Leighty ("Leighty") worked directly for the Pi Kappa Phi Fraternity as Director of Chapter Development.  (Comp. ¶¶ 9, 64).

4.      At all times material to this cause, Defendant Almazan was a one time member of the Pi Kappa Phi Fraternity Associate Chapter on the campus of Florida Atlantic University ("FAU").  (Comp. ¶ 3).

5.      Pi Kappa Phi Fraternity established a "colony" or associate chapter at Florida Atlantic University and began recruiting members to establish and found a chapter in Fall of 2013.  (Comp. ¶ 14).

6.      Plaintiff Angelo Gasparri ("A.J.") was "bid" (i.e., invited to membership) in late February 2015. Within two weeks, Plaintiff was elected to the non-executive board position of recruitment chair with responsibility for assisting the Vice-President or "Vice-Archon" with the chapter's member recruitment efforts. (Comp. ¶¶ 16, 17, 18).

7.      On September 13, 2014, after an FAU football game against another University, Plaintiff and other members of Pi Kappa Phi attended a tailgate party which was held at the residence of Harry Weiss. This party was not a designated Pi Kappa Phi event although there were several members of Pi Kappa Phi that attended.  (Comp. ¶¶ 19, 22).

8.      In compliance with both school policy and the laws of the State of Florida AJ did not consume or purchase any alcohol on the date of September 13th, 2014, nor did AJ cause anyone else to consume alcohol.  (Comp. ¶ 21).

9.      FAU's policies allow students who are over 21 years of age to consume alcohol both on and off campus. As a result, students over 21 years of age arriving at Harry's gathering with their own alcohol were allowed into the party, and would not be violating any rules of conduct. Further, the event was not a PiKapp sponsored event. (Comp. ¶ 23).

10.      As is common practice amongst campus fraternities, students not old enough to drink would receive a "mark" on their hand at the front door before entering.  Plaintiff AJ and a number of other PiKapp members stood at the Front door checking individuals and marking people who were 18-20 years old. Those old enough to drink were not marked. (Comp. ¶ 25).

11.      About midnight, Kyle Muir ("Kyle"), the elected New Member Educator and "Warden" for PiKapp called the members that attended the party into the garage. The members, estimated from 10 to 18, stood in a semi circle and faced Kyle who addressed the members. Then Plaintiff spoke to the members and shared about his personal commitment to PiKapp, what brotherhood meant to him, and the importance that chartering represented to their chapter. Unbeknownst to Plaintiff, a bottle of "Southern Comfort" liqueur believed to have been brought

by Harry was passed around. It is unclear as to how and why the bottle was passed during the presentations by the Warden, AJ and others. The room was notably dark and Plaintiff did not see who did or did not drink any specific bottle of bottle of liqueur, specifically the one described. (Comp. ¶¶ 26-32).

12.     Plaintiff never drank from the bottle, never touched the bottled in any way and did not encourage anyone in the garage to drink from the bottle of Southern Comfort. (Comp. ¶ 33).

13.     As presented by the affidavits attached to this Verified Complaint eleven other members who were present at this party, provided the testimony, under oath, that at no time did they feel forced, threatened, or intimidated or coerced by anyone to drink the Southern Comfort. Further, no Affiant attested that they felt they would be retaliated against if they chose not to drink the Southern Comfort liqueur.   No Pi Kappa Phi member engaged in any action that could be construed as hazing or indoctrination of any kind within the garage. (Comp. ¶¶ 34, 36, 41; Exhibit 8).

14.     On November 2, 2014, Plaintiff was elected President ("Archon") of the Associate Chapter and this term commenced on January 1, 2015.  (Comp. ¶¶ 43, 44).

15.     As Archon, Plaintiff had a duty to and was expected to attend a mandatory training at the Fraternity Headquarters in North Carolina, at his own expense, from January 2nd to the 4th, 2015.  This training covered many aspects of what Pi Kappa Phi believed to be important to the growth and development of a strong chapter, including Plaintiff's and other chapter elected **officer's expected performances of tasks** in the administration, operations, and finances of the chapter such as collecting membership dues through a conduit payment system set up by the fraternity "OmegaFi." (Comp. ¶¶ 45, 46; Exhibit 2; ).

16.     At one of the sessions attended by Plaintiff and another member, Aaron Sherman, the then Risk Management Chair, the representatives of Pi Kappa Phi Fraternity specifically asserted that if any accusations or issues arose in relation to the chapter, AJ and the Chapter would be provided with support from the national organization of PiKapp, and if necessary, these elected officers would be indemnified and PiKapp would provide legal assistance. (Comp. ¶ 47).

17.     As officer and member of the associate chapter, and **in exchange** for his participation and the payment of his dues, Plaintiff enjoyed the privileges of membership.  Also as part of the **expected performance** of Plaintiff on behalf of the fraternity, in his role as Archon,

Plaintiff oversaw the chapter's finances and collected dues from other members.  (Comp. ¶¶ 50,51; Exhibit 1).

18.     In performing this obligation, Plaintiff and Josh Shorey, the Treasurer, were instructed by Pi Kappa Phi to use an online accounting management tool called "OmegaFi" to collect dues and maintain finances of the Chapter.  *Only Plaintiff's name*, as President and sender of the notice, was on the form email that was sent to all members with outstanding balances.  Notices of outstanding balances were sent by Plaintiff to applicable members through this account management software. (Comp. ¶¶ 50,51; Exhibit 1).

19.     On February 24, 2015, Defendant Almazan received an automated email from yourchapter@omegafi.com as a reminder of an outstanding balance of dues owed to the fraternity Pi Kappa Phi.  (Comp. ¶ 52; Exhibit 1).

20.     A few hours later on the same day, Defendant Almazan responded to Plaintiff A.J. and informed Plaintiff of the following: "I am currently in the process of disputing this bill with omega fi.  I was never initiated into the fraternity and withdrew from the University." (Comp. ¶ 51; Exhibit 2).

21.     Defendant Almazan did not, at this time, indicate to anyone from the Pi Kappa Phi, including to *A.J. or to the treasurer Shorey*, regarding allegations of hazing. (Comp. ¶ 51; Exhibits 2 and 8).  As evidenced by sworn affidavits from other members who were present at the event in September and attested that they knew and interacted with Almazan, that he *did not express that he experienced any "hazing" at or after the bid party*: (Exhibit 8, page 12, Muir Affidavit; Exhibit 8, page 20, De La Cruz Affidavit; Exhibit 8, page 24, Wingard Affidavit; Exhibit 8, page 28, Shorey Affidavit; Exhibit 8, page 36, Sherman Affidavit).

22.     Defendant Almazan admits in his first responding email to receiving this bill for the dues that *he does not feel he should pay* and he is "currently disputing this bill […]."(Comp. ¶ 51; Exhibit 2).

23.     Plaintiff then responded to Almazan with the following statement: "Unfortunately you were part of the organization for one semester and we still had to pay your insurance as well as other fees and expenses and for this reason you must still pay your dues for your tenure in the fraternity." (Comp. ¶ 52; Exhibit 2, page 3).

24.     It was not until *AFTER* Plaintiff A.J., who was doing his job as Archon for Pi Kappa Phi to collect these dues, explained to Defendant Almazan why the dues were still owed,

that Defendant Almazan reacted in his second responding email the following sarcastic and extortionate statement to Plaintiff A.J.: "*Unfortunately I will contact the proper FAU officials to notify them of hazing "forcing all pledges to consume alcohol mixed with pre-workout*)."(Comp. ¶53; Exhibit 2, page 2)(emphasis added).

25.     Between February 24th and March 6, 2015, Almazan, with knowledge and express malice, and as confirmed by Leighty, made numerous false and defamatory statements about Plaintiff A.J. to FAU and Pi Kappa Phi.  (Comp. ¶¶ 58, 59).

26.     Having the foresight to recognize this as an extortionate threat, from what appeared to be a disgruntled former member, and there was a problem, Plaintiff relied upon these designated Advisors to provide guidance on this matter.  Plaintiff *immediately* brought the matter to the attention to these Advisors and sent them the full email string. (Comp. ¶53; Exhibit 2).

27.      At some time after, the advisors communicated to AJ and directed him not to take any action. Then, as confirmed by Leighty, between approximately February 25th and March 6th, Defendant Almazan did publish accusations of a libelous and defamatory nature against AJ Gasparri to Florida Atlantic University and Pi Kappa Phi. These false accusations were knowingly made by Almazan *without a factual basis* and with awareness of the harm they would cause. (Comp. ¶ 62).

28.     Plaintiff did not hear from anyone at Pi Kappa Phi until the first communication from Leighty in March 2015.  Leighty confirmed to Plaintiff that this interrogation was based on Almazan's accusations and repeated that he had not paid attention to any communication from the Advisors on the matter. (Comp. ¶¶ 68, 69).

29.     AJ was kept in the dark and received no further requests for information or communication from PiKapp, Leighty or the Advisors.  (Comp. ¶¶ 70, 71).

30.     Finally on March 13, 2015 Leighty, Angotti, and the Advisors from Pi Kappa Phi, contacted A.J. and Angotti directed unfounded accusations against Plaintiff.  Since A.J. had not spoken to any of Pi Kappa Phi's agents regarding the false accusations from Almazan *other than Leighty*, the false and slanderous accusations regarding Plaintiff including that A.J. providing *"false information to the staff and advisors"* could only have been communicated to Angotti and Pi Kappa Phi by Leighty.  Angotti informed A.J. that the decision to remove him from his position as Archon and revoke his membership to Pi Kappa Phi had already been made and signed off on by the National President of the organization. (Comp. ¶¶73 – 78, 81; Exhibit 3).

31.     Pi Kappa Phi informed their decision to expel Plaintiff from Pi Kappa Phi, to the FAU Leadership even though this unreasonable decision was based on unfounded accusations that were based on the catalyst of just collecting dues and then the extortionate email from Almazan, with no due diligence, no "investigative process", *or quasi-judicial due process*, to the FAU Leadership. (Comp. ¶¶ 73 – 79, 81; Exhibit 3).

32.     On or about March 15th, 2015 at 1:59 pm Justin Angotti sent an email from his Pi Kappa Phi Fraternity account and copied the Advisors, Leighty.  Angotti blind copied the members of the FAU associate chapter and other unknown recipients as evidenced by this that was forwarded email sent to A.J. from Aaron Sherman.  (Comp. ¶¶ 82-86; Exhibit 3).

33.     In this email Angotti propagated false, defamatory and libelous information designed to place blame upon, and discredit AJ Gasparri, in a blatant and repulsive attempt to avoid any issue or impact to Pi Kappa Phi's attempts at expansion at a time when fraternities were under public scrutiny. (Comp. ¶¶ 82-86; Exhibit 3).

34.     In this email Angotti, states that "Director of Chapter Development Scott Leighty conducted an investigation into the alleged incident." (Exhibit 3).

35.     However, in contradiction to Angotti's and Pi Kappa Psi's assertion of any due diligence, eleven members present at the party provided testimony, sworn under oath, that *no hazing or other similar activity that could be even remotely construed as forcing anyone to drink, took place at the party* on September 2014.  There are also inconsistent stories of the type of alcohol that was in the bottle in the garage.   These eleven affiants, including Plaintiff, identified the alcohol passed around as a bottle of liquor or Southern Comfort liqueur, not a pre-workout drink or supplement mixed with alcohol, as stated by Almazan in his extortionate email and believed by Angotti and Pi Kappa Phi as stated in the March 15 email where he asserted members were "forced to consume liquor that was mixed with pre-workout supplement." (Comp; Exhibits 2, 3, and 4).

36.     Pi Kappa Phi Fraternity, relying on the statements of Almazan, without meaningful and responsible due diligence, and in spite of the availability of exculpatory information, then made statements concerning Gasparri to Florida Atlantic University, members of the Pi Kappa Phi Fraternity, and the public at large, which were false, defamatory and injurious to Gasparri's Professional and Personal Reputation.

37.     October 9, 2015, the Plaintiff filed a multi count complaint against Movant Defendants requesting relief for 1) Defamation and 2) Intentional Infliction of Emotional Distress  3) Breach of Contract and 4) Negligence.

38.     On November 12, 2015, Defendants Pi Kappa Phi and Angotti filed for dismissal of the claims against them.   Defendants argue these claims should be dismissed on several grounds; 1) Plaintiff improperly commingled multiple defendants within Counts 3 and 4; 2) failure to establish a claim for defamation, and that Defendants enjoy a qualified privilege; 3) failure to establish a claim for Intentional Infliction of Emotional Distress; 4) failure to establish a claim for breach of contract, and; 5) failure to establish a claim for negligence.


## II.     STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 12(b)(6), a Court must determine whether a Plaintiff sets forth sufficient factual allegations to establish a claim upon which relief may be granted. In evaluating whether Plaintiffs have stated a claim, the Court must determine whether the pleading satisfies Fed. R. Civ. P. 8(a)(2).   To satisfy the pleading standard of Rule 8(a)(2), a Complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face.[1] The Court is required to construe the complaint liberally, assuming all facts contained within the allegations are true, and drawing reasonable inferences in favor of the Plaintiff.[2]  Further, in ruling on a Motion to Dismiss under Rule 12(b)(6), the Court must construe the Complaint in the light most favorable to the Plaintiff and accept all well-pled factual allegations as true.[3]

A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein.[4]  Finally, a Motion to Dismiss is not a forum to determine either the veracity of the facts, nor is it a forum to determine if the Defendants have presented a sufficient defense.[5]

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[2] *Iqbal*, at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, *556-557* (2007)); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325-26 (11th Cir. 2012).
[3] See *Sinaltrainal v. Coca-Cola Co.*, 578 F. 3d 1252 (11th Cir. 2009).
[4] *Twombly, 550 U.S.* at 556-557.
[5] *Twombly*, at 679; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("The issue to be decided is not whether the plaintiff will ultimately prevail, but whether the [plaintiff] is entitled to offer evidence to support the claims").

## III.   LEGAL ARGUMENT

### A.   Count 3 and Count 4 provide Defendants an opportunity to admit or deny the allegations as required by 8(b)(1)(b) and comply with Rule 10(b).

The Defendants' assertion regarding Count 3 and Count 4 is fundamentally flawed as each Defendant may enter an answer admitting or denying the allegation contained within the listed Count.  It appears that the Defendant's problem is derived simply from attempting to defend the matter as a unit.

Rule 8(a)(2) requires that a Plaintiff specify a "short and plain statement of the claim showing that the pleader is entitled to relief." Defendants cite Rule 10(b) as support for their position that they are not able to complete their charge in answering the complaint.  Rule 10(b) indicates that a "party must state its claims or defenses in numbered paragraphs" and that "each claim founded on a separate transaction or occurrence must be stated in a separate count".

In the case at hand, the Plaintiff's allegation are that false and defamatory information was published to members of at least two separate communities, specifically the Administration of Florida Atlantic University and the members of the Omega Phi Chapter of Pi Kappa Phi.  On information and belief there is at least one communication made to each community propagating the falsehoods embraced by the Pi Kappa Phi leadership.

The complaint properly outlies that the individuals included within Count 3 are the individuals responsible for the statements and their publications.   The Plaintiff has properly included all parties he believes are responsible for the defamation, and has pled count 3 to assert joint and several liability against the Defendants.  Similarly, the tragic impact upon the Plaintiff caused by the intentional actions is clear, the specific perpetrator of the action is not.

The Court should deny the Defendant's Argument 1, and in the alternative, if the Court believes that the defendants are not able to properly admit or deny each numbered paragraph of the complaint direct the Plaintiff to amend the complaint.[6]

### B.   Plaintiff has Properly Stated Claims for Defamation Against Moving Defendants Pi Kappa Phi and Justin Angotti

---

[6] "A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires." Fed. R.Civ. P. 15(a)(2).

### 1.    *All elements of defamation are contained within the complaint.*

In the Motion to Dismiss, Defendants claim that Plaintiff's Claim for defamation should be dismissed because Plaintiff fails to adequately establish a claim.  Defendants assert that Plaintiff "fails to link each particular remark to a particular defendant, specifically identify the persons to whom the remarks were made, as well as provide a time frame when the remarks were made."[7] The Complaint indeed links each defamatory statement to Pi Kappa Phi, through their agents or employees, Defendant Angotti, and non-Moving Defendant Leighty as well as provides a time frame when the defamatory communication was made: [8]

i.    **Defamatory Statements from Leighty to Pi Kappa Phi**: The first communication from Leighty to Plaintiff A.J. occurred in March 2015.[9]  A.J. provided Leighty information as best as he could remember regarding the September 13, 2014 event that occurred six months prior.[10]  The next communication from Leighty, Angotti, and the Advisors from Pi Kappa Phi, happened on March 13, 2015 where Angotti directed accusations against Plaintiff.[11] Since Plaintiff A.J. had not spoken to any of Pi Kappa Phi's agents regarding the September event *other than Leighty*, the false and slanderous accusations regarding Plaintiff including Plaintiff providing *"false information to the staff and advisors"* could only have been communicated to Angotti and Pi Kappa Phi.[12]

ii.    **Defamatory Letter from Pi Kappa Phi authored by Angotti sent to members of FAU associate chapter**:[13] On March 15, 2015, Angotti sent an email from his Pi Kappa Phi Fraternity account to the members of the FAU associate chapter in which he propagated false, defamatory and libelous information about Plaintiff A.J.[14]   The specific false defamatory statements were that "[i]t was alleged that during the chapter's Fall 2014 'bid day' party, the chapter's newest associate members were taken into a garage and encouraged and/or forced to

---

[7] PiKapp Angotti MTD, Doc. 13, p. 5.
[8] See *Jackson v. North Broward County Hospital District*, 766 So. 2d 256, 257 (Fla. 4th DCA 2000); *Fowler v. Taco Viva, Inc.*, 646 F. Supp. 152, 157-58 (S.D. Fla. 1986)(explaining that "the [p]laintiff must allege certain facts such as the identity of the speaker, a description of the statement, and  provide a time frame within which the publication occurred").
[9]  Comp ¶¶ 66- 69.
[10] Comp ¶ 68.
[11] Comp ¶ 75.
[12] Comp ¶ 81; Exhibit 3.
[13] Comp ¶¶ 82-87.
[14] Comp ¶ 82.

*consume liquor that was mixed with pre-workout supplement*."[15]  Angotti further asserted the false statements against AJ: "Additionally, it should be noted that throughout the course of the Fraternity's investigation into the alleged incident, AJ provided false statements to the staff and local advisors, denying any involvement in or knowledge of the incident."[16]

iii.        **Defamatory communication to FAU from Pi Kappa Phi through its agents or employees on or before March 10, 2015**:        The Complaint properly provided that on information and belief, Pi Kappa Phi Fraternity, through Angotti or other representatives propagated and published these false accusations to members of the FAU community by both email and voice, and did cause the plaintiff substantial and irreparable harm through these publications.[17]  The Complaint also provided the factual basis upon which the information and belief that Pi Kappa Phi was the source of the defamatory false accusations was founded: "The FAU Leadership proffered that Pi Kappa Phi had made the choice to corroborate accusations made by Almazan, and that despite the school's gathering of information, that was sufficient for a Code of Conduct hearing and moving forward with the investigation."[18]

> ## 2.        *The assertion of a qualified privilege and its applicability to this claim is a potential affirmative defense, a Question of Fact, and in this case are not sufficient grounds to dismiss.*

The question of whether the defamatory statements to FAU and in the emails sent out by Angotti and Pi Kappa Psi are privileged is a question of law properly decided by a court *if the circumstances surrounding the communication are undisputed* or *so clear under the evidence as to be unquestionable*.[19]

The facts and circumstances surrounding these defamatory statements are disputed and there are many new facts proffered by Defendant and other questions of fact.  Among the new facts proffered from the Defendants towards their defense in their Motion to Dismiss, "It must be noted that, the Pi Kappa Psi chapter at Florida Atlantic University was an associate chapter and not a fully chartered chapter.  This is an important distinction because associate chapters *do not*

---

[15] Comp ¶ 84; Exhibit 4; Note the discrepancy in the information gathered by Pi Kappa Phi regarding the type of alcohol allegedly being consumed during the members' time in the Garage.
[16] Comp ¶ 86; Exhibit 4.
[17] Comp ¶¶ 72, 87 and 92.
[18] *Five for Entm't S.A. v. Rodriguez*, 877 F.Supp.2d 1321, 1329 (S.D. Fla. 2012)( this form of pleading is permitted, a plaintiff is still required to allege with particularity the factual basis upon which the information and belief was founded").
[19] See *Nodar v. Galbreath*, 462 So.2d 803, 810 (Fla.1984); see also *John Hancock Mut. Life Ins. Co. v. Zalay*, 581 So.2d 178 (Fla. 2d DCA 1991).

*enjoy the same rights afforded to a fully chartered chapter.*"[20] While Plaintiff is at a loss to what this new fact of what rights are afforded means, other than it is clear there are disputed facts and this motion to dismiss is premature, Plaintiff will assume it is a reason given in an attempt for Pi Kappa Psi to justify why they did not follow any of their own quasi-judicial proceedings set forth in the Pi Kappa Supreme Laws.[21]  However regardless of what "rights" are afforded by Pi Kappa to their members, the actions that led to, and defamatory statements contained in, this "disciplinary action;" were contrary to the requirements of due process requiring any quasi-judicial proceeding to be essentially fair; were not in accord to their own "Pi Kappa Supreme Laws;" and are evidence of Defendants' intention to injure Plaintiff.

Defendants take the position that they enjoy a "qualified privilege."[22]  But this assertion is not consistent with the facts alleged in the complaint which the Court must construe in the light most favorable to the Plaintiff and accept all well-pled factual allegations as true.[23]

As authority to this position that they enjoy qualified privilege, Defendants misstate the law and state "the publication of a *disciplinary action* may not form the basis of a claim for defamation."[24]  Defendants lead this Court to the authority of this proposition and cite to *Loeb v. Geronemus* and provide that "[t]he trial court dismissed the defamation count and the *dismissal was subsequently upheld at the appellate level*."[25]

In *Loeb v. Geronemus*, the Florida Supreme Court affirmed the appellate court however, *reversed the judgment as it pertained to the defamation count*.[26]  In *Loeb*, members of a Jewish Community Center, which Plaintiff belonged, communicated false accusations against the Plaintiff in an effort to expel him from the Center.[27]  Specifically defendant Geronemus, at a public meeting of the Board of Governors of the Center said: "Loeb is a bad example for our children. His scandalous activities are a bad example. He is a disgrace to any Jewish Organization. He should be expelled by a unanimous vote of all of us here."[28]  The *Loeb* Court

---

[20] PiKapp Angotti MTD, Doc. 13, p. 1; *Ingalsbe v. Stewart Agency, Inc.*, 869 So.2d 30, 35 (Fla. 4th DCA 2004)( "A motion to dismiss for failure to state a cause of action may be granted only by looking exclusively at the pleading itself, *without reference to any defensive pleadings or evidence in the case*")(emphasis added).
[21] *See* Exhibit 10.
[22] PiKapp Angotti MTD, Doc. 13, p. 6.
[23] See *Sinaltrainal v. Coca-Cola Co.*, 578 F. 3d 1252 (11th Cir. 2009).
[24] PiKapp Angotti MTD, Doc. 13, p. 5.
[25] PiKapp Angotti MTD, Doc. 13, p. 5.
[26] 66 So.2d 241, 244 (Fla. 1953).
[27] *Id.* at 243.
[28] *Id.*

11

looked to the general rule that that statements and communications made in connection with the various activities of such an organization or group enjoy a *qualified privilege*.[29]   The Court added that "[u]nder this rule it is held that members of such bodies 'may report on the qualifications of applicants, prefer charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation*, so long as they act without malice*.'"[30] "When a matter which otherwise would be a qualifiedly privileged communication is published *falsely, fraudulently and with express malice and intent to injure the persons against whom it is directed, the communication loses its qualifiedly privileged character and the parties lay themselves liable to a suit for damages in an action of libel or slander*."[31] The Court noted, the malice which vitiates qualified privilege "must be actual and not merely inferred from falsity."[32]

In the *Loeb* Court's analysis as to whether the words used against Loeb by the members of the Community were defamatory, the Court explained that in assessing the basic question of whether certain language is defamatory and actionable, "the words used are not to be construed or taken in their mildest or most grievous sense, but in that sense in which they may be understood and in which they appear to have been used and *according to the ideas which they were adopted to convey to those who hear them or to whom they are addressed*."[33]   The *publication made should be construed as the common mind would understand it*.**"[34]**

> The *Loeb* Court ruled:
> Viewed in this light, [as the common mind would understand it] it appears to us that, if proven, the statements allegedly made by the defendants, when considered with the charge that they were false and were fraudulently and maliciously made to defame, degrade and injure the plaintiff, and thereby injure him in his reputation and goods, were of such a character and made under such circumstances *as to remove the cloak of privilege and require of the defendants that they answer*.[35]

In their Motion to Dismiss Defendants attempt to minimize the harsh accusatory false words and state "[s]ince the letter of March 15, 2015 contains nothing more than an

---

[29] *Id.* at 243
[30] *Id.* ("The rule relative to qualified privilege is always subject to this limitation, as stated, that in connection with such activities the parties must act without malice")(internal quotations omitted).
[31] *Id*. at 244.
[32] *Id*. at 244.
[33] *Id*. at 243.
[34] *Id*. at 244.
[35] *Id*. at 243.

announcement of expulsion from membership, outline the allegations and facts, it cannot under the circumstances be considered libelous in nature."[36]

The Defendants then mislead this Court and mischaracterize Plaintiff's allegations towards the express malice shown by Defendants by citing only the partial text of ¶ 82 of the Complaint, "Plaintiff's concede that moving Defendants were motivated not by a desire to harm Plaintiff, but an attempt to 'avoid any issue or impact to Pi Kappa Phi's attempts at expansion at a time when fraternities were under public scrutiny.'"[37]   The full paragraph ¶ 82, which alleges express malice in Defendants intention to harm Plaintiff, actually reads:

> On or about March 15th, 2015 at 1:59pm Justin Angotti sent an email from his Pi Kappa Phi Fraternity account to the members of the FAU associate chapter in which he propagated false, defamatory and libelous information designed to ***place blame upon, and discredit AJ Gasparri***, ***in a blatant and repulsive*** attempt to avoid any issue or impact to Pi Kappa Phi's attempts at expansion at a time when fraternities were under public scrutiny.[38]

When "***construed as the common mind would understand it***" these false allegations can destroy a person's reputation as well as forever put AJ's character of honesty in question. These words were clearly made with express malice as to vitiate any qualified privilege.

### 2.    *The Defendants do not enjoy a qualified privilege*

Defendants do not enjoy a qualified privilege because this "disciplinary action" did not follow any requirements of due process or adhere to the declaration of rights every member has.[39] Defendants' statement of a new fact that "associate chapters ***do not enjoy the same rights afforded to a fully chartered chapter***" is merely an attempt to justify not following fair and reasonable procedures and afford AJ the rights he deserved.[40]  AJ was a member of Pi Kappa Psi. The Pi Kappa Supreme Laws, subd. 2 Responsibilities and Rights, § 2 provides:

> ***Every member*** has a duty to understand and abide by the Constitution, Supreme Laws, Ritual of the Fraternity, and resolutions and policies of the Supreme Chapter; as well as any provisions of chapter bylaws or house rules. Ignorance of a specific provision is not an acceptable defense. ***Members accused of conduct violations have the following rights***:
>
> a.      To be informed of the charges against them;

---

[36] PiKapp Angotti MTD, Doc. 13, p. 7.
[37] PiKapp Angotti MTD, Doc. 13, p. 7.
[38] *Id.*(emphasis added).
[39] *See* Exhibit 10, Subd. 2, § 2.
[40] PiKapp Angotti MTD, Doc. 13, p. 1.

      b.      To request an informal resolution of the case;
      c.      To be allowed a reasonable time to prepare a defense;
      d.      To hear and respond to evidence upon which a charge is based;
      e.      To appeal as provided herein;
      f.      To waive some or all of these rights.[41]

Plaintiff, a member of Pi Kappa Psi, was not afforded **any of the enumerated rights** set forth by the Fraternity.

### 3. *Defendants defamatory statements were made with express malice to vitiate any arguable qualified privilege*

The express malice which vitiates a qualified privilege must be actual malice, i.e., ill will, hostility and an evil intention to defame and injure, which cannot be inferred simply from the falsity of the statements.[42] Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic in the circumstances.[43]

Other courts have agreed that proof of malice can include evidence of the unreasonableness of the defamer's actions and statements.[44] In *Asinmaz v. Semrau*, the Florida Fourth District Court of Appeals stated that proof of malice in fact involves evidence from which the trier of fact could conclude that the challenged statement was motivated by ill will and the desire to harm.[45] The Court explained how this proof of express malice can be established indirectly, i.e., "by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive."[46]

It was unreasonable for Pi Kappa Psi and Angotti to believe Almazan's false accusation without any factual basis.   It was unreasonable to not properly interview other members that were at the September Event and even more unreasonable to  not consider Almazan motive to not pay his dues and that these false accusations were made **right after** Almazan sent his

---

[41] Exhibit 10, p. 3.
[42] *Rush Hampton Industries, Inc. v. Home Ventilating Institute,* 419 F. Supp. 19, 22 (M.D.Fla.1976).
[43] *Gibson v. Maloney*, 231 So.2d 823, 825 (Fla. 1970)
[44] *Asinmaz v. Semrau*, 42 So.3d 955 (2010).
[45] *Id*. at 958.
[46] *Id*. at 958.

extortionate email sent to AJ.[47]

Courts have also considered evidence towards malice and intent to injure when assessing the totality of the circumstances and events that occur in close temporal proximity to the defamatory statements.[48] In *Randolph v. Beer*, allegedly defamatory statements were made concerning the operation of a credit union.[49] Evidence suggesting malice included that the defendant was the source of a kickback rumor concerning the plaintiff and that there was contemporaneous ongoing animosity between the parties about the credit union's operation.[50] Similarly, in *American Ideal Management v. Dale Village* the existence of express malice was based on ***conduct surrounding*** termination of the plaintiff's management contract.[51] The court found there was evidence that the reasons given for the termination were manufactured after the fact; ***thus, the expressions of malice were made closely in time to the contract's termination***.[52]

The facts in this case that are undisputed show evidence of malice based on the unreasonableness of the actions taken by Pi Kappa Psi without any basis or proper due diligence or even due process in the short time right after Almazan made his false accusations.  What is still in dispute, and discovery is needed, is why Pi Kappa Psi took such a knee jerk reaction without following Pi Kappa Phi's own Disciplinary Code which provides for a standard of Due Process.[53]  Pi Kappa Psi contradicted their own standard set forth in § 15 which reads "Formal rules of evidence will not be applied, nor will deviations from prescribed procedures necessarily invalidate a decision, ***unless significant prejudice to the Respondent or Complainant may result***."[54]

Defendants' also maintain they enjoy a qualified privilege because the emails sent on March 15, 2015 were made in "good faith ***after an internal*** investigation."[55]  Plaintiff disputes this alleged new fact that an "internal investigation" even took place let alone if it was made in good faith.  For Example, Pi Kappa Psi did not consider the extortionate email from Almazan or

---

[47] Exhibit 2.
[48] *Thomas v. Tampa Bay Downs, Inc.,* 761 So.2d 401, 405 (2000) (Appellant would have to provide evidence of express malice in closer temporal proximity to overcome the presumption of good faith attaching to the qualified privilege").
[49] *Randolph v. Beer* , 695 So.2d 401 (Fla. 5th DCA 1997),
[50] *Id.*
[51] *American Ideal Management v. Dale Village* , 567 So.2d 497 (Fla. 4th DCA 1990)(emphasis added).
[52] *Id.*
[53] *See* Exhibit 10, p.2.
[54] *Id.* (emphasis added).
[55] PiKapp Angotti MTD, Doc. 13, p. 7.

review and consider other exculpatory evidence through interviewing other members present.

The unreasonableness of believing Almazan's false accusations after he sent the threatening email and then publishing these unreasonable conclusions to FAU and then blind copying to the members and other unknown recipients is evidence of express malice.[56]   It was unreasonable to believe Almazan especially under the circumstances that Almazan had never expressed to any member for six months that he experienced any hazing.   As evidenced by the following statements from the sworn affidavits from other members present at the September event, attached as Exhibits to the complaint, attested that they interacted with Almazan, Almazan did not express that he experienced any "hazing" at or after the September event:

- Kyle Muir:   "[A]s warden, I routinely met with fraternity's new members (approximately on a weekly basis), including Mr. Almazan, and at no point did Mr. Almazan ever express any negative feelings about the fraternity, any events, or A.J. In fact, subsequent to the "bid party" at one of our weekly meetings, Mr. Almazan expressed an interest in running for a position on the executive board." (Exhibit 8, page 12, "Muir Affidavit").

- Kevyn De La Cruz:   "I know Mr. Almazan personally, and I am the person who introduced him to the fraternity.  Subsequent to the September 13, 2014 "bid party," I spoke to Mr. Almazan on numerous occasions.  In fact we lived in the same building at the time.  At no point during our many conversations after the "bid party" did Mr. Almazan express any negative feelings towards the fraternity or A.J., nor did he discuss any of the event that he now alleges occurred on September 13, 2014." (Exhibit 8, page 20, "De La Cruz Affidavit").

- Nicholas Wingard:   "I carpooled with Mr. Almazan to the fraternity event subsequent to the "bid party" and at no time during my interactions with him did he ever express any negative feelings towards the fraternity or A.J.  Specifically Mr. Almazan never expressed any complaints or grievances relating to the September 13, 2014 "bid party." (Exhibit 8, page 24, "Wingard Affidavit").

- Josh Shorey:  [D]uring this period of time, I considered Mr. Almazan to be a friend and I hung out with him on numerous occasions after the September 13, 2014 "bid party."  Specifically we carpooled to the FAU v. FIU football game on October 2, 2014, and at no point did Mr. Almazan express any negative or damaging feelings towards the fraternity or A.J. during that time or any other occasion." (Exhibit 8, page 28, "Shorey Affidavit").

- Aaron Sherman:  "I have witnessed Mr. Almazan bring his own alcohol to numerous parties/events.  Also I know with certainty that there were several "new members" who elected not to consume alcohol during the ceremony at the "bid party" and at no

---

[56] *Asinmaz v. Semrau*, 42 So.3d 955 (2010).

time did they experience any form of retaliations or threats."  (Exhibit 8, page 36, "Sherman Affidavit").

Pi Kappa Phi did not follow any quasi judicial proceedings in this matter nor did they follow their own guidelines set forth in the Pi Kappa Gold Book.[57]  Generally quasi-judicial proceedings for disciplinary actions do not have to have the same safeguards as criminal defendants but they must be "*essentially fair*."[58] There was nothing essentially fair here and there is no dispute that AJ was significantly prejudiced and this was without reason.    AJ immediately sent the extortionate email to the Pi Kappa Psi advisors.[59]  He was then kept in the dark and even hung up on when he attempted to communicate with Pi Kappa Psi.[60]  This action of bringing a false accusation by Almazan written in an extortionate email from a former member that dropped and now does want to pay his dues to the advisors, as advised, also contradicts the defamatory false accusation that AJ was lying and trying to hide any facts as to what occurred on the September 2014 event.

The affidavits provided with the complaint from eleven members that were present at the September Event, provide a different story as to the events that took place than one person who may have been disgruntled for a number of reasons in addition to just not wanting to pay his dues to Pi Kappa Psi.[61]  The motive or reasoning to send an extortionate email that is only precipitated by an attempt to collect these dues and then make false accusations six months after the date of the alleged "hazing" is questionable and should have been investigated by Pi Kappa Psi.

At this stage in the proceedings, the Complaint provides enough facts that demonstrate that this "disciplinary action" and the defamatory statements made were made with express malice and therefore satisfy the pleading standard of Rule 8(a)(2), and the Motion should be denied.

**C.      The Intentional Tortious actions of the Defendants negatively impacted the Plaintiff, and caused Emotional Distress, the level to which the Plaintiff was impacted is a Question of Fact.**

---

[57] *See* Exhibit 10.
[58] See *Carillon Cmty. Residential v. Seminole Cnty.*, 45 So.3d 7, 9-10 ("Due process is a flexible concept and requires only that the proceeding be *essentially fair*"); Accord *Matar v. Florida Int'l. Univ.*, 944 So. 2d 1153, 1160 (Fla. 3d DCA 2006 (holding that the due process requirement of a student administrative proceeding is that the proceeding *must be essentially fair*)(emphasis added).
[59] Comp. ¶ 54; Exhibit 1.
[60] Comp. ¶¶ 70, 71).
[61] *See* Exhibit 8.

Defendants misstate the facts in the Complaint, "Here, the only alleged defamatory statements of the Moving Defendants were contained in the March 15, 2015 email from Justin Angotti to the FAU Pi Kappa Phi members. (D.E. 1, Exhibit 4)."[62]

The very fact that the Plaintiff seeks to align their behavior with that of "mere insults, threats, or false accusations" is on its face repulsive.  The Defendant rightly outlines the law in this area and we reiterate it here:  "Liability is found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."

In the case at hand, a National Organization committed to the growth and expansion of leadership and brotherhood made the affirmative decision to destroy the aspirations of a committed and successful member of their organization for their own purposes.  These purposes clearly involved the rapid and immediate deflection of attention away from themselves and the protection of their public image.  They chose to destroy the hard fought efforts of a young man to accomplish a position of stature and leadership within the Florida Atlantic Community, rather than stand by their own principles.  This was accomplished purposely, and with malice, and the results speak for themselves.  Plaintiff suffered emotional distress due to the intentional actions of the Defendants; the elimination of two leadership positions; a lifelong record of probation during college; the entrance of the young man into a therapeutic remedy; and the emotional damage of having been expelled from his social community.

The trier of fact determines whether or not the actions and consequences rise to the level of severe and outrageous conduct as outlined by the Defendant.  However, for a Motion to Dismiss, the Complaint adequately pleads plausible sufficient facts that establish a claim for intentional infliction of emotional distress and therefore satisfy the pleading standard of Rule 8(a)(2), and the Motion should be denied.

### D.    Plaintiff's Breach of Contract Claim is Properly Pled and Should Not Be Dismissed

The existence of an agreement between Pi Kappa Phi and the Plaintiff is a question of fact, and the pleadings, taken as true on their face, suggest that a contract existed.  The Plaintiff is not asserting the "Gold Book" establishes a contract as asserted by the Defendants.

---

[62] PiKapp Angotti MTD, Doc. 13, p. 11.

18

There was a contractual relationship between Plaintiff and Pi Kappa Phi. Clearly both parties had mutual assent and were in action to accomplish a common goal of chartering the chapter, recruit members, collect dues on behalf of Pi Kappa Phi, and maintain finances in a uniform management program "Omegafi." As officer and member of the associate chapter, and *in exchange*, or consideration, for his participation and the collection of the dues, for example, Plaintiff enjoyed the privileges of membership. As Archon, Plaintiff, an elected officer, was *expected to perform* his part of the agreement as the elected *officer's expected performances of tasks* in the administration, operations, and finances of the chapter such as collecting membership dues through a conduit payment system set up by the fraternity "OmegaFi."

This performance, or fulfillment of the agreement, of Plaintiff was to collect money on behalf of Pi Kappa Psi. In fact, the mass email sent by A.J. to the other members to collect the dues is titled "Notice of Debt to Pi Kappa Phi."[63] It does not read "Notice of Debt to *Associate Chapter*." The actions of recruiting towards membership of the Fraternity and the collection of dues provided benefits or consideration to both parties.

Whatever that relationship, it bears directly upon what promises existed between the Plaintiff and Defendants and whether the Defendants failed to live up to the elements of this agreement. The Complaint adequately pleads plausible facts that establish a claim for breach of contract and satisfy the pleading standard of Rule 8(a)(2), and the Motion should be denied.

### E.     Plaintiff's Negligence Claim is Properly Pled and Should Not Be Dismissed

In the Motion to Dismiss, the Defendants claim that Plaintiff "cannot" as opposed to "does not" establish a claim for negligence.[64] The Defendants then site U.S. v. Stevens for the proposition that to establish negligence, "a plaintiff *must prove* duty, breach, causation, and damages."[65] Defendants then assert that Plaintiff attempts to "manufacture" a standard of care based upon the Pi Kappa Phi internal policies and procedures and cite only to paragraph 149 of the complaint which reads "PiKapp breached its duty to AJ by failing to adhere to its own internal policies and procedures as published within "The Gold Book of Pi Kappa Phi Fraternity"[66]

---

[63] Exhibit 1, page 2.
[64] PiKapp Angotti MTD, Doc. 13, page 13.
[65] 994 So. 2d 1062, 1065-66 (Fla. 2008)(emphasis added).
[66] PiKapp Angotti MTD, Doc. 13, page 14.

First, Defendants misapply the pleading standard.  The Plaintiffs do not have to "prove" anything at this stage of the proceedings.   To satisfy the pleading standard of Rule 8(a)(2), a Complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face.[67]  The Court is required to construe the complaint liberally, assuming all facts contained within the allegations are true, and drawing reasonable inferences in favor of the Plaintiff.[68]  *A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all of the factual allegations.*[69]

Second, the Complaint pleads several facts that establish a duty besides Pi Kappa Phi's breach of "internal policies and procedures."  Plaintiffs assert several facts that establish a duty and that that duty was breached. The determination as to whether the elements exist to support a finding of negligence is a question of fact, and the pleadings, taken as true on their face, suggest that a relationship and a Verbal Agreement existed.

The Defendants cite to several cases with the proposition that there is a blanket rule that violations of internal policies do not establish a legal duty.[70]  However, the existence of a duty is a question of law in Florida, and the "duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader `zone of risk' that poses a general threat of harm to others."[71] The Defendants cite to *Langbehn v. Pub. Health Trust of Miami–Dade Cnty.*, which explains very clearly that the establishment of a duty is more abstract and may arise, not only from written policy or procedures, but from several sources such as *the facts of the case*.[72]

The Complaint adequately pleads plausible sufficient facts that establish a claim for negligence and satisfy the pleading standard of Rule 8(a)(2), and the Motion should be denied.


## IV.    CONCLUSION

Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss, with prejudice, in all respects, or, alternatively, allow for amendment of the complaint.

---

[67] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[68] *Iqbal*, at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, *556-557* (2007)); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325-26 (11th Cir. 2012).
[69] *Twombly, 550 U.S.* at 556-557.
[70] PiKapp Angotti MTD, Doc. 13, page 13.
[71] *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502, 503 (Fla. 1992).
[72] 661 F.Supp.2d 1326, 1342 (S.D.Fla.2009) ("A duty may arise from a number of sources, including legislative enactments and administrative regulations, judicial interpretations of such laws, other judicial precedent, *and the facts of the case.* [...] A duty is established for the protection of others against unreasonable risks") (emphasis added) (internal quotation marks and citation omitted).

Dated:  December 19, 2015                         Respectfully submitted,


  /s/Angelo A. Gasparri
Angelo A. Gasparri, Esq.
1080 S. Federal Highway
Boynton Beach, Fl. 33435
Phone: 561-826-8986
Fax:  561-935-9706